# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 15, 2010          Decided June 14, 2011

No. 10-7024

ALI MAHMUD ALI SHAFI, INDIVIDUALLY AND AS NATURAL
GUARDIAN OF PLAINTIFF LAMIA ALI SHAFI, ET AL.,
APPELLANTS

v.

PALESTINIAN AUTHORITY, ALSO KNOWN AS PALESTINIAN
NATIONAL AUTHORITY, ALSO KNOWN AS PALESTINIAN
INTERIM SELF-GOVERNMENT AUTHORITY AND PALESTINIAN
LIBERATION ORGANIZATION,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00006)

*Robert J. Tolchin* argued the cause and filed the briefs
for appellants.

*Laura G. Ferguson* argued the cause for appellees. With
her on the brief was *Kevin G. Mosley*. *Richard A. Hibey* and
*Mark J. Rochon* entered appearances.

Before: SENTELLE, *Chief Judge*, ROGERS, *Circuit Judge*,
and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

SENTELLE, *Chief Judge*: Appellant Ali Mahmud Ali Shafi and his wife, Shirin Ali Shafi, filed this action against the Palestinian Authority (PA) and the Palestinian Liberation Organization (PLO), seeking to recover damages under the Alien Tort Statute, 28 U.S.C. § 1350. The Shafis alleged in the district court and argued before us that the torture and "physical and mental abuse" of Ali Shafi is actionable under that statute, and also claimed on behalf of their minor child a derivative negligence claim under Israeli law. The district court dismissed the actions for failure to state a claim within the jurisdiction conferred by the ATS. For the reasons set forth below, we affirm the judgment of the district court and further conclude that the district court did not err in declining to exercise pendent jurisdiction over the alleged negligence claim under Israeli law.

## I.

The Shafis brought this action in the United States District Court for the District of Columbia seeking to recover under the Alien Tort Statute, 28 U.S.C. § 1350 (ATS), for events allegedly occurring between 2001 and 2002. According to the allegations of the complaint, which we, like the district court, are required to accept as true for purposes of the consideration of a motion to dismiss, Ali Shafi, a Palestinian, served as an agent and confidential informant for Israel for many years, ending in 1994 when he moved from the West Bank to Israel. Widespread violence broke out several years later in the West Bank, the Gaza Strip, and Israel. This violence, which lasted

from September 2000 until 2005, is referred to in the complaint as the "Intifada."[1] In September of 2001, in the midst of the Intifada, Ali Shafi and his family returned to the West Bank to visit his mother. On the night of September 21, Ali Shafi was arrested by PA security officers and taken to a PA security service building, where he was stripped, handcuffed, questioned about his activities on Israel's behalf, and ultimately beaten. Severe beatings and other forms of physical torture continued for several months. During this period, Ali Shafi was not provided with a change of clothing and was not permitted to bathe.

Three and a half months into his imprisonment, Ali Shafi received a visit from representatives of the Red Cross. After this visit, the physical abuse of Ali Shafi by the PA security guards intensified. Then, in January 2002, Palestinian leader Raed al Karmi—whom Israel had accused of masterminding violent attacks against Israelis— was killed in an explosion in the West Bank. PA officers accused Ali Shafi of having provided information and assistance leading to the assassination of al Karmi, and demanded a confession. Eventually, after continued beatings, Ali Shafi signed the confession that had been prepared for him and was formally charged by the PA with the assassination of al Karmi and with spying for Israel. After a trial that lasted half an hour, Ali Shafi admitted the charges in hopes that he would be given a lenient sentence. Instead he was sentenced to death. In March 2002, while awaiting transfer from the prison in Qalqilya to Ramallah for his execution, Ali Shafi escaped from captivity during an Israeli invasion of Qalqilya. Seven years later, the Shafis initiated this action.

---

[1] This period of violence is more properly termed the "Second Intifada." The First Intifada began in 1987 and ended in 1993. *See, e.g.*, Demian Casey, Note, *Breaking the Chain of Violence in Israel and Palestine*, 32 Syracuse J. Int'l L. & Com. 311, 314 (2006).

Appellees moved to dismiss under Rule 12(b)(6) for failure to state a claim for relief, Rule 12(b)(1) for lack of subject matter jurisdiction, and Rule 12(b)(2) for lack of personal jurisdiction. The district court granted the motions to dismiss, not passing on the personal jurisdiction argument, but determining that appellants had not pled any claim for relief within the subject matter jurisdiction granted by the Alien Tort Statute. We agree and affirm.

## II.

We will dispense rather quickly with the first argument offered by the appellees in the district court and before us as a basis for dismissal. They argue that the Torture Victim Protection Act of 1991 (TVPA) provides the only cause of action available to victims of torture in preemption of any right that might have otherwise existed as a common law claim within the jurisdiction granted by the ATS. The TVPA creates a civil action against "an individual who, under actual or apparent authority, or color of law, of any foreign nation" subjects an individual to torture or extrajudicial killing. 28 U.S.C. § 1350 note. The Act also requires exhaustion of remedies. Appellees' argument is that by enacting this specific remedy, Congress intended to take torture cases out of the general jurisdiction conferred by the ATS and therefore preempt actions such as the present one brought under the more general statute. They then reason that because the defendants are not individuals acting under actual or apparent authority or color of law, the current action cannot be maintained under the TVPA. Therefore, they contend, it must be dismissed.

The district court decided that the TVPA did not preempt the present claims, but proceeded to determine that they must be dismissed for failure to state claims within the jurisdiction conferred by the ATS in any event. We think it unnecessary to

explore the preemption issue. All parties agree that the present claims do not seek relief under the TVPA. The district court held, and we will ultimately affirm, that they do not state claims under the ATS. We therefore see no reason to belabor the interpretation of the TVPA, which does not apply to the present action; nor need we explore the question of preemption, as the ATS claims will be dismissed in any event. We therefore proceed to an analysis of appellants' claims under the ATS.

## III.

In analyzing the ATS and considering its applicability to the claims of the Shafis, we note first the narrowness of its language. The statute does no more than grant to the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The statute creates no jurisdiction over any general actions for tort or otherwise against private actors under domestic law of this or any other nation, but applies only to torts committed in violation of the laws of nations or in violation of a treaty of the United States. We will not spend much time or ink in rehashing the general history of the Act, as the Supreme Court has fairly recently provided a very full discussion in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). We commend to the reader that decision for a full and scholarly treatment, while we confine our discussion to the portions of *Sosa* determinative of this case, along with other precedents relevant to the issue before us.

Both claims by the Shafis depend upon the same fundamental question: Does the ATS provide jurisdiction in the district court over a civil action by an alien for torture

committed by nonstate actors such as the PLO?[2] We previously considered this question in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). Although the named party defendant in *Tel-Oren* was a nation state, the decision dealt with claims against the PLO, one of the two nonstate actors before us in the present controversy. In a brief *per curiam* opinion, we affirmed the decision of the district court dismissing the claims brought against the PLO under the ATS. *Id.* at 775. The district court had dismissed on dual grounds, one of which was the subject matter jurisdiction question we consider today. The *per curiam* opinion does not differentiate between the two bases, but provides at least an authoritative framework for the dismissal ordered by the district court herein.

Each of the three judges on the *Tel-Oren* court filed a separate opinion, and the three opinions differ significantly in their rationale. However, each of those separate opinions reach the same conclusion on the controlling question. As Judge Edwards put it: "I do not believe the law of nations imposes the same responsibility or liability on non-state actors, such as the PLO, as it does on states and persons acting under color of state law." *Id.* at 776. He therefore "vote[d] to affirm the District Court's dismissal for lack of subject matter jurisdiction." *Id.* at 798.

Judge Bork differed from Judge Edwards in detail, specifically in that he read Judge Edwards's opinion as supporting the proposition that the ATS, in addition to providing jurisdiction, created a cause of action. *Id.* at 801. Judge Bork believed that the ATS did not create "a cause of action sufficient to support jurisdiction under [the ATS]." *Id.* at 799.

---

[2]Here we discuss the two principal claims of the Shafis. We will discuss the alleged pendent claim of the minor Ali Shafi child separately below.

Thus, the two judges who directly addressed the question held that, contrary to the arguments of appellants in that case and in this, the ATS does not impose the same liability for torture on nonstate actors as on nation states, and therefore, the ATS does not provide jurisdiction against such defendants.[3]

The third member of the *Tel-Oren* court agreed in affirming the dismissal, but would have done so on arguably broader grounds. He was of the view that the case was nonjusticiable, as it was controlled by the political question doctrine. *Id.* at 823 (Robb, J., concurring). In short, the *Tel-Oren* court, although diverse in approach, all provided support for the proposition that torture claims against nonstate actors were not within the jurisdictional grant of the ATS. Had nothing occurred between the announcement of that decision in 1984 and the entry of our decision today, circuit precedent would compel that we affirm the dismissal ordered by the district court. The relevant events between 1984 and today not only do not change our decision from the one entered in *Tel-Oren*, but support a continuation of that precedent.

One intervening event discussed by the parties need not be considered. Congress enacted the TVPA in 1992, but as we note above, we need not construe that Act as the jurisdictional issue governed by the ATS provides a sufficient rule of decision for the question before us. However, of great relevance to our inquiry is the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). In that case, Sosa, a Mexican national, was one of a group of bounty hunters, who "abducted Alvarez" in Mexico and took him "to El Paso, Texas, where he was arrested by federal officers." *Id.* at 698. After being

---

[3]Judges Edwards and Bork differed in their rationales and likely as to the scope of potential liability for ATS claims other than torture.

acquitted of the underlying criminal charge against him, Alvarez returned to Mexico but brought suit in the United States against Sosa alleging, *inter alia*, a claim "under the ATS, for a violation of the law of nations." *Id.* at 698. Justice Souter, writing for the Court, entered a thorough and scholarly analysis of the history and effect of the Alien Tort Statute. The *Sosa* opinion first addressed a question not answered by the *per curiam* opinion in *Tel-Oren*. That is, Alvarez argued that the ATS "was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law." *Id.* at 713. The *Sosa* Court found that reading "implausible" and held that "the statute was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." *Id.* at 713-14.

Having established the fundamental nature of the power granted in the ATS, the *Sosa* Court nonetheless rejected the position of defendant Sosa that "the ATS was stillborn because there could be no claim for relief without a further statute expressly authorizing adoption of causes of action." *Id.* at 714. Therefore, the Court went on to consider what claims for relief courts could entertain under the jurisdictional grant of the ATS. In conducting that analysis, the Court considered the state of the common law and international law at the time of the first enactment of the ATS in the Judiciary Act of 1789. After careful analysis, the Court concluded "that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Id.* at 724. The Court "found no basis" for believing that Congress contemplated any examples of such torts beyond three primary offenses theretofore identified by Blackstone: (1) violation of safe conducts; (2) infringement of the rights of ambassadors; and (3) piracy. *Id.* Three Justices, concurring separately, believed that only those three causes of action would

be cognizable under the ATS to this day. *See id.* at 739-51 (Scalia, J., concurring, joined by Rehnquist, C.J., and Thomas, J.). The majority, however, left open the possibility that nothing "categorically preclude[s] federal courts from recognizing a claim under the laws of nations as an element of common law." *Id.* at 725. While this might lend hope to appellants' cause before us, the Court went on to caution that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind." *Id.*

The Court then set out five reasons for exercising caution in this area. First, the understanding of the common law has changed since the ATS was enacted in 1789. At that time, the prevailing conception of the common law was of a binding body of law that existed separate and apart from the positive laws of any jurisdiction; now, "there is a general understanding that the law is not so much found or discovered as it is either made or created." *Id.* In other words, a judicial determination whether an alleged violation of international law constitutes a violation of common law actionable under the ATS is largely an exercise of discretion rather than an exercise in construing pre-existing, binding law. *See id.* at 720-21, 725-26. Second, as the prevailing conception of the common law has changed over time, so too has the prevailing conception of the role of the courts in making it. Since *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." 542 U.S. at 726.

The final three reasons provided by the *Sosa* Court—all related to the proper role of the judiciary in our tripartite government—are particularly compelling. The Court's third reason is that the decision to create a private right of action for violation of an international norm is better left to the legislature.

*Id.* at 727. "Even when Congress has made it clear by statute that a rule applies to purely domestic conduct," the Court said, "we are reluctant to infer intent to provide a private cause of action where the statute does not supply one expressly." *Id.* Fourth and relatedly, the potential foreign relations consequences of making violations of international norms actionable in United States federal court "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* Courts should exercise "great caution" in allowing suits that would involve them in passing judgment on the behavior of foreign governments towards their own citizens. *Id.* at 727-28. Finally, the Court observed that "modern indications of congressional understanding of the judicial role in the field [of international law] have not affirmatively encouraged greater judicial creativity." *Id.* at 728. Congress has not seemed eager to give the courts more latitude in defining violations of international human rights law. *Id.*

Having set forth its reasons for directing judicial caution in considering the recognition of claims beyond the historic three categories of Blackstone, the *Sosa* Court went on to give some guidance for the exercise of that caution by lower courts considering allegations of such new torts against the law of nations. "[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 163 n.h (1820) (illustrating the specificity with which the law of nations defined piracy)). Conspicuously, the Supreme Court noted that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor

such as a corporation or an individual." *Id.* at n.20. In so doing, the Supreme Court cited Judge Edwards's concurrence from *Tel-Oren* for the proposition that there was insufficient consensus in 1984 that torture by private actors violates international law.[4]

Applying its cautious standard, the *Sosa* Court held that the forceful abduction of Alvarez did not constitute a tort cognizable under the statute. As the Court noted, Alvarez's approach "would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by law of the jurisdiction in which it took place." *Id.* at 736. Similarly, the proposition advanced by the appellants before us could open the doors of the federal courts to claims against nonstate actors anywhere in the world alleged to have cruelly treated any alien. To recognize such a sweeping claim would hardly be consistent with the standards of caution mandated by the *Sosa* Court.

We are advertent to the argument of appellants that other circuits may have taken a broader view of the governing questions. As we noted in note 4, *supra*, *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), did conclude that a sufficient international consensus existed to support the implication of a claim for relief within the jurisdiction conferred by the ATS for genocide by nonstate actors. Also, the Eleventh Circuit in *Estate of Amergi ex rel. Amergi v. Palestinian Authority*, 611 F.3d 1350 (11th Cir. 2010), took an arguably broader view than we now express. However, neither of these binds us. *Tel-Oren* and especially *Sosa* do. We further note that the Eleventh Circuit, in dealing with the Common Article 3 question which

---

[4]We note that the Supreme Court in footnote 20 offered for comparison with Judge Edwards's *Tel-Oren* opinion the opinion of the Second Circuit in *Kadic v. Karadzic*, 70 F.3d 232, 239-41 (2d Cir. 1995), which concluded that genocide by private actors did violate international law.

we discuss *infra*, recognized that "Common Article 3 is exceedingly broad and at times vague; to afford ATS jurisdiction for each and every violation of its wide-ranging provisions would violate the command of *Sosa* that federal courts exercise 'vigilant doorkeeping.'" *Id.* at 1363.

The Shafis offer two grounds for distinguishing their complaint from the claims asserted in *Tel-Oren* and *Sosa*. Neither is persuasive. In their first claim for relief, they assert that the defendants' conduct is in violation of international norms because it took place as part of an "armed conflict" within the meaning of international law, and that the use of torture breaches peremptory rules of armed conflict reflected in Common Article 3 of the Geneva Conventions. Common Article 3 applies "[i]n the case of an armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." It mandates that non-combatants "shall in all circumstances be treated humanely," and it explicitly prohibits "violence to life and person, in particular . . . cruel treatment and torture." The first difficulty with the Shafis' claim is that it is not obvious that Common Article 3 applies under the circumstances they have alleged. The amended complaint describes the Intifada as occurring in Israel, the West Bank, and the Gaza Strip. Although Israel is a High Contracting Party to the Geneva Conventions, the PLO is not,[5] and the status

---

[5]In June 1989, the PLO submitted documents to the government of Switzerland, purporting to accede to the Geneva Conventions on behalf of the State of Palestine. The Swiss Government (in its capacity as depository of the Conventions) rejected this attempt at accession, and informed the PLO that "[d]ue to the incertainty [sic] within the international community as to the existence or the non-existence of a State of Palestine," the Swiss Government was not able to determine whether the accession was valid. *See Note of Information*, Government of Switzerland, Berne, Sept. 13, 1989.

of the PLO and the nature of Israeli relations with the territory wherein the alleged torture took place, are subjects of continuing dispute. These claims fit well within the reasons provided by the *Sosa* Court for the cautious approach.

The Supreme Court made clear in *Sosa* that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732-33. The potential foreign relations consequences of making violations of international law, as alleged by the Shafis, actionable in the courts of the United States "should make courts particularly wary of infringing on the discretion of the legislative and executive branches in managing foreign affairs." *Id.* at 726.

Finally, the Shafis argue that "the [Palestinian Authority's] conduct violated universally recognized and applicable norms of international customary law prohibiting torture by a public official." App. Br. 22. That argument cannot prevail. Appellants are advancing a theory that nonstate actors can nonetheless be public officials. We need not decide whether that is a possibility, as there is clearly no sufficiently universal norm of international law supporting such a concept to support the creation of an ATS cause of action for torture against a nonstate actor, even if that actor falls into the appellants' proposed expanded category of "public official."

We do not purport to decide that the ATS can create no actions against private actors. *Sosa* makes clear that the analysis of whether "international law extends the scope of liability . . . to the perpetrator being sued, if the defendant is a private actor" pertains to the "given norm" being analyzed. 542 U.S. at 732 n.20. This conclusion is also evident from *Sosa*'s treatment of

Judge Edwards's *Tel-Oren* concurrence, which acknowledged a clear trend toward individual responsibility for violations of international law norms, 726 F.2d at 794-95 (Edwards, J., concurring), specifically considered whether "torture today is among the handful of crimes to which the law of nations attributes individual responsibility," *id.* at 795, and concluded that it was not, *id.* As *Sosa* noted, Judge Edwards's conclusion was based on the "insufficient consensus in 1984 that torture by private actors violates international law." 542 U.S. at 732 n.20 (citing *Tel-Oren*, 726 F.2d at 791-95 (Edwards, J., concurring)). As noted above, *Sosa* contrasted this conclusion with the Second Circuit's conclusion that there *was* a "sufficient consensus in 1995 that genocide by private actors violates international law." *Id.* (citing *Kadic v. Karadzic*, 70 F.3d 232, 239-41 (2d Cir.1995)). By citing these two opinions, the Court apparently did not mean to suggest that one was right and the other wrong, or that both erred in considering the sufficiency of the international law consensus for private actor liability on a norm-specific basis; rather, by highlighting the lapse of eleven years and the difference in the claims alleged, *Sosa* underscores the context-dependent nature of the ATS analysis.

A categorical bar of ATS suits against nonstate actors would be at odds with *Sosa* and with Judge Bork's *Tel-Oren* concurrence in another crucial respect. In providing his "thoughts as to the possible original intention" underlying the ATS, 726 F.2d at 815 (Bork, J., concurring), Judge Bork cited Blackstone's statement of the 18th-century paradigms of the "principal offenses against the law of nations": violation of safe conducts, infringement of the rights of ambassadors, and piracy, 726 F.2d at 813 (citing 4 BLACKSTONE'S COMMENTARIES *68, *72), with particular emphasis on piracy, *id.* at 813-15 & 814 n.23. Indeed, that piracy is among the core causes of action contemplated by Congress in enacting the ATS appears beyond dispute, *see Sosa*, 542 U.S. at 724 (majority opinion), 749

(Scalia, J., concurring in part), 760 (Breyer, J., concurring in part); *Tel-Oren*, 726 F.2d at 781 (Edwards, J., concurring). Yet piracy in violation of the law of nations is by definition perpetrated by nonstate actors: "'A pirate is one who roves the sea in an armed vessel without any commission or passport from any prince or sovereign state, solely on his own authority, and for the purpose of seizing by force, and appropriating to himself without discrimination, every vessel he may meet.'" *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 163 n.h (1820) (Story, J.) (quoting 2 M.D.A. AZUNI, THE MARITIME LAW OF EUROPE § V:3 (1806)); *see also Sosa*, 542 U.S. at 732 (citing *Smith*'s definition of law of piracy); *Tel-Oren*, 726 F.2d at 814 n.23 (Bork, J., concurring) ("'[Piracy] could not be committed by nations.'") (quoting G.H. HACKWORTH, DIGEST OF INTERNATIONAL LAW § 203 (1941)). The concept underlying the ATS as a statute affording a civil remedy against piracy thus cannot be reconciled with the notion that the statute only recognizes claims against state actors. A second of Blackstone's principal offenses of the law of nations – infringement of the rights of ambassadors – was also addressed in *Sosa*, which stated that the enactment of the ATS was in part a "respon[se]" to "a concern over the inadequate vindication of the law of nations" after a nonstate actor assaulted a French diplomat in Philadelphia (the "Marbois Affair"). 542 U.S. at 716-17. A view of the ATS that only recognizes claims against state actors thus finds no support in Judge Bork's or Judge Edwards's *Tel-Oren* opinions, in *Sosa*, or in the widely accepted understanding of Congress's intent in enacting the statute.

That all said, it remains the case that applying the cautious approach dictated by *Sosa*, and consistent with the separate opinions of Judges Edwards and Bork in *Tel-Oren*, we must hold that the district court properly dismissed this action. As the Supreme Court noted in *Sosa*, Judge Edwards observed in *Tel-Oren* that there was in 1984 an "insufficient consensus

. . . that torture by private actors violates international law." 542 U.S. at 732 n.20. In 2011 it remains the case that appellants have shown us no such consensus. The complaint does not state a claim cognizable within the jurisdictional grant of the Alien Tort Statute.

IV.

The Shafis' third claim is a claim of negligence, brought in the name of Ali Shafi's minor daughter against both defendants under the law of the state of Israel. The Shafis brought this claim pursuant to 28 U.S.C. § 1367, which allows a district court to exercise supplemental jurisdiction over any claims related to claims over which the court has original jurisdiction. After dismissing the Shafis' ATS claims, the district court dismissed the negligence claim as well, noting that § 1367(c) gave it permission to do so.

"Whether to retain jurisdiction over pendent . . . claims after the dismissal of the federal claims is a matter left to the sound discretion of the district court that we review for abuse of discretion only." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (internal quotation marks omitted). We can hardly say that the district court abused its discretion by declining to hear this claim. The claim arose from events in another nation. The claim is made under the laws of that other nation. All parties are citizens of other nations and have no connection with the United States or specifically, with the District of Columbia. Again, we must affirm the decision of the district court.

Conclusion

For the reasons set forth above, we affirm the judgment of the district court dismissing all claims.

ROGERS, *Circuit Judge*, concurring: I join the court's opinion and write separately only to add a note of caution with regard to going beyond the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), by reading too much into *Sosa*'s reference to the three norms of conduct identified by Blackstone as violations of international law prior to 1789. Although there is some historical evidence that the ATS as originally conceived was designed to prevent international incidents and harms to the foreign relations standing of the new nation, *id.* at 715–16, no evidence has been identified to suggest that there is any talismanic quality to the so-called "Blackstone three," Concurring Op. at 1 (Williams, J.). Indeed, in *Sosa*, the Supreme Court recognized that other norms could be identified. *See* 542 U.S. at 732. Our concurring colleague does not suggest there is any authority in the ATS's 230-year history for requiring that Blackstone's "three" bear a "family resemblance," Concurring Op. at 1 (Williams, J.), to one another or to these other norms, offering only one possible way of characterizing the analysis based on the premise—a dubious premise, given *Sosa*—that without such resemblance the "three" provide "little guidance for assessing candidates for ATS recognition," *id.*

It would appear more prudent to take *Sosa* on its own terms. As noted, the Supreme Court cited Blackstone's "three" merely as "historical paradigms" of norms that possessed sufficiently "definite content and acceptance" at the time of the statute's enactment. 542 U.S. at 732; *see also id.* at 724. Separately, *Sosa* discussed the historical basis for the ATS, including the Marbois incident and other events surrounding the enactment of the Judiciary Act of 1789, *id.* at 716–19, as well as the reasons for judicial caution before recognizing an ATS cause of action, *id.* at 725–28; *see* Op. at 9–10. Consequently, there is no basis for concluding that *Sosa* prevents courts from recognizing an international law norm unless its lineage can be traced to Blackstone's "three." It is, therefore, just as plausible, and likely more so, to conclude that Blackstone's "three" were

distinct and independent norms of international law as it existed in 1789, each of which may provide some insight regarding the definiteness a norm developed after 1789 must possess to justify recognition under the ATS.

Advisory or speculative musings on an issue neither briefed nor argued nor necessary to resolve the instant appeal seem particularly odd when the proffered analysis is bereft of substantive grounding. Indeed, in acknowledging the need to "expand[] the scope of the hypothetically triggered conflict to include international incidents more generally," or to "inquir[e] whether the defendant's alleged behavior might provoke war if the United States occupied no more than an average position in global power rankings," Concurring Op. at 4 (Williams, J.), our concurring colleague attempts to introduce vague and slippery concepts into the ATS analysis. This despite *Sosa*'s emphasis on the "definite content and acceptance" required of an international law norm, 542 U.S. at 732, its discouraging of "judicial creativity," *id.* at 728, and its concern for "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," *id.* at 727. Considering traditional principles of judicial restraint, especially in light of *Sosa*'s specific grounds for caution in the ATS context, *id.* at 725-28, further judicial analysis of the scope of the ATS is best postponed until the issue is ripe.

WILLIAMS, *Senior Circuit Judge*, concurring:  I concur in the court's opinion.  But I think that in the context of this case it is appropriate to probe a little more into the meaning of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Court made clear that a current international law norm, if it is to find a home under the ATS, must have no "less definite content and acceptance . . . than the historical paradigms familiar when § 1350 was enacted."  *Id*. at 732.  The Court was referring to the three offenses against the law of nations that Blackstone had identified as rules "overlapp[ing] with the norms of state relationships," namely "violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Id*. at 715.  There are two key features of the Court's use of Blackstone to infer criteria for international law norms that might give rise to ATS claims.  First, the opinion clearly sets forth definiteness as only a *minimum* criterion (one of several) for acceptance under the ATS:  "*Whatever the ultimate criteria* for accepting a cause of action . . . , we are persuaded that federal courts *should not* recognize private claims under federal common law for violations of any international law norm *with less definite content and acceptance* . . . .").  *Id*. at 732 (emphasis added).  Second, though the Court clearly showed interest in analogizing from the three offenses, the opinion does not link the Blackstone three into an intellectually coherent family of wrongs.  But unless the Blackstone examples exhibit some sort of family resemblance, they provide little guidance for assessing candidates for ATS recognition.

It seems to me that the unifying feature of the three offenses is that their punishment protects and facilitates the system of international relations arising out of the Westphalian view of national sovereignty, particularly with respect to the avoidance and termination of war.  Piracy involves a rejection of the Westphalian system itself—pirates

remove themselves from the national building blocks of international society (and hence are enemies of all mankind). See 4 WILLIAM BLACKSTONE, COMMENTARIES *71 (noting that the pirate has "renounced all the benefits of society and government, and has reduced himself afresh to the savage state of nature, by declaring war against all mankind, all mankind must declare war against him"). Safe conducts, as Blackstone notes, were a matter of "public faith"—a promise by the sovereign that the entire nation needed to maintain—violation of which may "be a just ground of a national war." *Id.* at *68-*69. Offenses against ambassadors are an affront to the foreign sovereign himself, "as [ambassadors] represent the persons of their respective masters, who owe no subjection to any laws but those of their own country . . . ." 1 WILLIAM BLACKSTONE, COMMENTARIES *253. Both of these, moreover, facilitate negotiation among sovereigns, enabling them to head off war and, once war has begun, to bring it to an end.

The system of international relations implied from the Blackstone three, then, is one in which the threat of war among sovereigns is fully recognized, but international law, especially safe conducts and the rights of ambassadors, protect the system of diplomacy and intercourse among sovereign nations, and thereby curb the risk of war or its prolongation. 4 WILLIAM BLACKSTONE, COMMENTARIES *66-*68 ("The law of nations is a system of rules . . . to decide all disputes, to regulate all ceremonies and civilities, and to insure the observance of justice and good faith, in that intercourse which must frequently occur between two or more independent states, and the individuals belonging to each. This general law is founded upon this principle, that different nations ought in time of peace to do one another all the good they can, and in time of war as little harm as possible, without prejudice to their own real interests. . . . [O]ffences against this law are

principally incident to whole states or nations, in which case recourse can only be had to war . . . .").

The ATS's ability to ensure adequate "vindication of the law of nations," *Sosa*, 542 U.S. at 717, fits this paradigm nicely. The concern was that U.S. citizens might engage in incidents that could embroil the young nation in war and jeopardize its status or welfare in the Westphalian system. *Id.* at 715-18. Similarly, foreign violators, if sufficiently linked to the United States, could create an incident threatening the United States's peace. Indeed, under the Confederation, a French adventurer had assaulted a representative of France, one Francis Barbe Marbois, in Philadelphia. Lacking any national power over the miscreant, the Continental Congress directed the Secretary for Foreign Affairs to tell Marbois that "Congress have heard with extreme regret that an insult has been offered to one of the servants of his most Christian Majesty" and to explain how the federal character of the union impeded any direct punitive action. Kenneth C. Randall, *Federal Jurisdiction over International Law Claims: Inquiries into the Alien Tort Statute*, 18 N.Y.U. J. INT'L L. & POL. 1, 25 (1985). *Sosa* in effect reads the adoption of the ATS (with other provisions) as the framers' response to these international hazards. 542 U.S. at 715-20.

For cases against American citizens violating the law of nations, there would likely be jurisdiction over violations of norms where the offense (especially if unpunished) would expose the United States to the risk of war, and perhaps to other comparable risks. That principle obviously would encompass an American's assault on a foreigner present in the U.S. under a safe conduct (or anywhere in the world under a U.S.-issued safe conduct). Other international law violations by Americans meeting the definiteness test and risking America's exposure to foreign conflict might also fit.

As to cases against foreigners, violations of the law of nations would be actionable under the ATS if they matched piracy as an affront to Westphalian sovereignty itself, or if the foreign perpetrator were linked to the United States by residence or by some other feature such that American disregard of the offense might cause serious blame to fall on the United States. Thus Blackstone, speaking of safe conduct violations, points to "the interest as well as duty of the government, under which [violators] *live*, to animadvert upon them with a becoming severity, that the peace of the world may be maintained." 4 WILLIAM BLACKSTONE, COMMENTARIES *68 (emphasis added).

To be sure, given the United States's current military and economic position, few states would respond to a Marbois-like incident by declaring war. But the Westphalian framework can be adapted—either by expanding the scope of the hypothetically triggered conflict to include international incidents more generally, or by inquiring whether the defendant's alleged behavior might provoke war if the United States occupied no more than an average position in global power rankings.

Of course, *Sosa*'s insistence on prudential concerns forms an additional overlay on this conceptual framework, as it would on any. Even where plaintiffs can demonstrate a definite norm (and, under this conceptual framework, one that meets the Westphalian purpose), a court would still have to consider the practical consequences of recognizing a cause of action under the ATS.