KLEINFELD, Circuit Judge,
dissenting, with whom BEA and IKUTA, Circuit Judges, join:
I respectfully dissent.
“[T]here must be some rule of law to guide [a] court in the exercise of its jurisdiction.” [1] The complaint in this case seeks damages and an injunction against Rio Tinto, a British-Australian corporation, for wrongs against people in Bougainville, Papua New Guinea.[2] Now that our court has adopted universal jurisdiction to grant tort damages for violations by foreigners against foreigners in foreign lands of “the law of nations,” in a plethora of opinions that cannot agree on what the “law of nations” prohibits, we on the Ninth Circuit now exercise jurisdiction over all the earth, on whatever matters we decide *798 are so important that all civilized people should agree with us.
We have no such jurisdiction. The majority claims it under a 1789 statute passed by the First Congress that conferred tort jurisdiction on the new federal courts for torts in violation of the “law of nations.” That statute was intended to enable our courts to address wrongs done in the United States to foreigners and wrongs done outside any foreign state’s territory. Here is the statute:
The district courts shall have original jurisdiction of any civil áction by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.[3]
The statute does not say “in the United States or in any foreign state.” The majority reads it as though it does.
The majority errs in claiming jurisdiction because:
(1) the statute does not say that it applies within the territory of other states and its historical context shows that its purpose was to afford a remedy for wrongs committed within the United States;
(2) the reference to the “law of nations” does not imply applicability within other countries, and such application would itself violate the law of nations;
(3) the inference of such application from the phrase “the law of nations” is prohibited by Supreme Court holdings that statutes do not apply extraterritorially unless they say so or clearly so imply; and
(4) jurisdiction over piracy on the high seas does not imply jurisdiction over wrongs committed within the territory of a foreign state.
The consequences of the majority’s claim are a new imperialism, entitling our court, and not the peoples of other countries, to make the law governing persons within those countries. Our court now asserts entitlement to make law for all the peoples of the entire planet.
The Alien Tort Statute does not so empower us. It was promulgated to enable foreigners to sue for violations in America of a narrow set of norms, where failure to vindicate the wrongs might embroil our weak, new nation in diplomatic or military disputes. The wrongs were to ambassadorial officials in the United States, and piracy, sometimes by Americans. There are three classes of territory, not two, for purposes of law of nations analysis: territory within the United States; territory outside the United States and outside any other state; and territory outside the United States and within another state. Both the last two are extraterritorial, but the law of nations differs as between them. Piracy occurs within the second class. Jurisdiction has always extended extraterritorially to the high seas, not because piracy was more heinous than other crimes, but because imposition of any state’s law could offend no other state’s governance of its own territory.
Advocates of universal jurisdiction see themselves as demonstrating enlightened open-mindedness to international law norms; instead, universal jurisdiction violates the most long-established, central and fundamental principle of the law of nations: “equality of sovereignty,” as it is called, meaning each sovereign’s authority over its subjects in its own territory equals *799 that of other sovereigns within their respective territories, and excludes other sovereigns’ authority within that sovereign’s territory. Whether this is always a good rule as a matter of policy is debatable, but whether it is historically the most fundamental rule of the law of nations is not.
Our case is by Papua New Guineans, against a British-Australian company, for wrongs allegedly committed in Bougainville in connection with the civil war between Papua New Guinea and the people of Bougainville. Justice Stevens would describe this type of lawsuit, where foreign plaintiffs sue foreign defendants for wrongs committed in foreign countries, as a “foreign-cubed” action. The complaint seeks class action certification, equitable relief, and compensatory and punitive damages against Rio Tinto. Every single wrong claimed by the plaintiffs is alleged to have occurred in Bougainville, either by Rio Tinto or by the government of Papua New Guinea acting with the encouragement of Rio Tinto. The injunction sought would be an order by an American district judge compelling environmental and other remedial action by Rio Tinto in Bougainville. No relationship is alleged between any of the wrongs claimed, or the remedies sought, and any American citizen or the United States.
The Governments of the United Kingdom of Great Britain and Northern Ireland, and of the Commonwealth of Australia, argue as amici that “it is a bedrock principle of international law that each sovereign nation is equally entitled to prescribe laws and to adjudicate claims regarding those persons within its sovereign territory.”[4] They are correct. They made substantially the same argument as amici before the Supreme Court in Morrison v. National Australia Bank[5] The Supreme Court accepted it.[6] Scholarship in other countries has supported this British and Australian view, and criticized overweening American claims.[7]
*800 I. Historical Context.
The First Congress passed the Alien Tort Statute to deal with domestic violations of the law of nations that created risks for our foreign relations, and perhaps our new nation’s continued existence. The problem was not that some far-away wrongdoer might violate the law of nations in some other country, but that violations had occurred and would occur within the United States that could, if unremedied, cause diplomatic or military hostility by other nations. We had just signed a peace treaty with Great Britain after a War of Independence we barely won. We could ill afford diplomatic problems with the British, who bordered us on the north, the Spanish, who then bordered us on the south and west,[8] or the French, whose support had been essential to our independence.[9]
Given our precariousness, the First Congress was concerned that American, not foreign, violations of the law of nations might “afford just causes of war,”[10] a war we likely could not win. The law of nations established that the state in which it was violated must afford a remedy, or else the victim state was entitled to take “reprisal” for “denial of justice” by the state in which the wrong occurred. Thus, if, say, a French consul’s right was violated in Philadelphia, and American courts afforded no remedy, then France was entitled to reprisal, which could even include war. This problem is not confined to the eighteenth century. For example, in the Don Pacifico affair of 1850, a mob in Athens wrecked a British subject’s house, and when his claim for compensation from the Greek government was resisted, the British fleet was ordered to Greece to compel monetary settlement.[11] The Iranian government’s refusal to remedy the hostage crisis of 1979 to 1981 is a recent example.
The Federalist Papers justified creation of federal courts in part because “denial of justice” for violation of the law of nations would justify “reprisal.” Federalist 80 by Hamilton explained that a federal judiciary needed jurisdiction over matters “which involve the PEACE” because “[t]he union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever to be accompanied with the faculty of preventing it” since “the denial ... of justice” is “classed among the just causes of war.” [12]
Two specific violations of the law of nations within the United States compelled immediate promulgation of the Alien Tort *801 Statute in 1789.[13] In the Marbois affair of 1784, a French national had assaulted a French consul in Philadelphia.[14] Interference with an ambassador or consul violates the law of nations, and failure to afford protection or a remedy would entitle France to a “reprisal” against the United States.[15] France lodged a diplomatic protest with the United States because the affray, on American soil, was an American responsibility. Our Articles of Confederation government lacked a national judiciary, and had to rely on Pennsylvania state courts to provide a remedy. The national government had no means of assuring that those state courts would.[16]
This problem arose again in 1787, shortly after the Constitutional Convention in Philadelphia. A New York City constable entered a Dutch diplomat’s residence with a warrant for one of the diplomat’s domestic servants. The Dutch government protested the violation of its sovereignty.[17] This violation of the law of nations in New York complicated our relations with the Netherlands.[18]
These violations of the law of nations occurred on American soil. That is why they required an American response to head off reprisals.[19] As Justice Stevens explained in the oral argument in Sosa, the “only [relevant law of nations violations the First Congress] knew about had taken place in the United States” and “[t]hey certainly would not have been concerned about an assault on the—say, the English ambassador in Paris by a Frenchman.”[20]
Because these violations of the law of nations took place on American soil, American sovereignty allowed, and the law of nations required, the United States to provide an adequate means of redress.[21] The *802 Alien Tort Statute afforded a remedy necessary to assure peace when the law of nations was violated within the United States.[22] The nation’s security would be at risk if the state courts failed to provide appropriate remedies for violations of the law of nations occurring within their jurisdictions.[23] “The concern was that U.S. citizens might engage in incidents that could embroil the young nation in war and jeopardize its status or welfare in the Westphalian system. Similarly, foreign violators, if sufficiently linked to the United States, could create an incident threatening the United States’s peace.”[24]
The Alien Tort Statute enables alien plaintiffs to file civil actions in federal district courts, thereby providing for federal jurisdiction regardless of whether state courts would entertain the claims. It does not say that such torts give rise to federal jurisdiction despite the absence of any American nexus—that is, when the torts are committed in other countries by and against aliens. There is no reason why it would say this, since violations of the law of nations abroad and between foreigners would have given rise to no risk of “reprisals” against the United States.
*803 II. The Law of Nations Prohibits Jurisdiction Over “Foreign-Cubed” Torts.
Murray v. Schooner Charming Betsy held in 1804 that a statute must be construed if possible to comply with, rather than violate, the law of nations.[25] “An act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.”[26] So, in that case, a federal law prohibiting commerce with France or its possessions was held not to apply to a Danish-owned vessel trading with and in a French possession, despite its literal applicability.[27] Because Charming Betsy, like our case, was “foreign-cubed,” the rule of construction made the statute inapplicable.[28]
The Charming Betsy canon barred jurisdiction based on the most fundamental principle of the law of nations: “equality of sovereignty.”[29] Equality of sovereignty requires that every sovereign is to be treated as the equal of every other in its entitlement to govern persons within its own territory.[30] “Under international law, a state has ... sovereignty over its territory,” [31] which “implies a state’s lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there.”[32] It means that Papua New Guinea, not the United States, is entitled to govern conduct by non-Americans in Papua New Guinea, just as the United States may govern in the fifty U.S. states,[33] What little authority there is for *804 one world state to impose a law having effect in another has generally been limited to circumstances where the conduct affects its own citizens or interests.[34]
This bedrock principle stems from the settlement of the Thirty Years’ War by the Peace of Westphalia in 1648. The purpose of the principle is to reduce pretexts for wars.[35] The principle of equal sovereignty compels the corollary that one sovereign cannot exercise authority over conduct within another sovereign’s territory.[36] As Chief Justice Marshall wrote in The Antelope: “No principle of general law is more universally acknowledged, than the perfect equality of nations.... It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone.”[37] The Schooner Exchange v. McFaddon held that the “full and absolute territorial jurisdiction being alike the attribute of every sovereign, [it is] incapable of conferring extra-territorial power....” [38]
Sosa v. Alvarez-Machain reaffirms the vitality of this principle by confirming the continuing authority of Vattel’s The Law of Nations as an authoritative source for determining the intent of the Alien Tort Statute.[39] Vattel is an authority because the First Congress relied on him.[40] Vattel states that “sovereignty carries with it a right ... over all property, public, common, and private; it is the right of sovereign control over all parts of the territory belonging to the Nation.... Whatever takes place there is subject to his authori *805 ty.”[41] The point emphasized repeatedly by jurists and scholars is that, in the absence of a clear congressional declaration to the contrary, federal courts should not “pretendí ] to be the custos morum of the whole world.”[42]
Recently, some advocacy groups have found receptiveness in Europe toward universal jurisdiction over unpopular foreign officials accused of war crimes and other offenses against the law of nations.[43] But even such aggressive claims as the recently-stayed case in Spain against former U.S. executive officials for alleged war crimes in Guantanamo and Iraq are criminal prosecutions, not private tort cases.[44] These criminal cases depend on decisions by government prosecutors and their supervisors, who may, unlike private plaintiffs, be subject to them governments’ judgments about diplomatic consequences. And despite these aggressive assertions of judicial power, there is no consensus that universal jurisdiction exists for private civil claims.[45] The majority’s assertion of universal jurisdiction over private claims, unlike executive branch decisions, can embroil our country in diplomatic and military disputes entirely unchecked by the elected branches of our government.
In the United States, the source of this new judicial aggressiveness is our sister circuit’s decision in Filarbiga v. Pena-Irala.[46] Filarbiga held that a Paraguayan permanent resident alien living in the United States could sue another Paraguayan also living in the United States for torture in Paraguay. The language in Filarbiga most supportive of the majority’s decision in the case at bar is this assertion of a broad principle: “It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction.”[47] Filarbiga, unlike our majority, immediately qualifies this broad principle in the next sentence: “A state or nation has a legitimate interest in the orderly resolution of disputes among those within its borders ...,”[48] as plaintiff and defendant were in that case. Filarbiga further qualifies its decision by giving effect to Paraguayan law.
Filarbiga, though, does invite the broader reading our majority gives it, by quot *806 ing (out of context) as its chief authority for such universal jurisdiction two sentences from Mostyn v. Fabrigas[49] in 1774, saying that actions may be brought in England “though the matter arises beyond the seas.” The Second Circuit overlooked the rest of Mostyn. The case arose in Minorca, one of the Balearic Islands in the Mediterranean, which had become a British possession in 1713. Mostyn sued the Governor General of Minorca, a British official, for wrongfully beating and falsely imprisoning him. Central to Mostyn's reasoning was that Minorca was ceded to the Crown of Great Britain by the Treaty of Utrecht.[50] The case turned on whether the governor general had abused “the authority delegated to him by the King’s letters patent.”[51] Lord Mansfield wrote that “the Privy Council determines all cases that arise in “the plantations [such as the American colonies], in Gibralter, or Minorca, in Jersey, or Guernsey.”[52] Thus, the case was not foreign-cubed at all. It was not a case arising offshore, but within the British Empire against a British official.[53] Slater v. Mexican National Railroad Co. cites Mostyn in holding that a Texan may sue for an injury in Mexico by a Colorado company.[54] There is nothing foreign-cubed about Mostyn or Slater. Congress has subsequently expressly conferred universal jurisdiction on American courts for torture abroad,[55] vitiating any question about whether the Filartiga result stands, but Congress has not conferred universal jurisdiction for the torts to which our majority applies it.[56]
Judges of the International Court of Justice,[57] British law lords, and jurists around the world have lamented the aggressive claims to rule the world by courts claiming universal jurisdiction. “It is not for a national court to ‘develop’ international law by unilaterally adopting a version of that law which, however desirable, forward-looking and reflective of values it may be, is simply not accepted by other states.”[58] Though Filartiga and its recent companions claim to embrace international law, they defy its most fundamental principle, equality of sovereignty. Imposition of putative international norms in foreign- *807 cubed cases by American courts is “contrary to customary international law.”[59] American judges purporting to implement customary international law have not addressed these criticisms from judges in other countries.
Congress has never given us “a clear mandate” for the wrongs alleged in the complaint before us.[60] Sosa did not open the door to our unconsented entry. The Court suggested that there may be some international norms that violate the law of nations in addition to piracy, safe conducts, and assaults against ambassadors, but warned courts to be cautious in creating new claims.[61] Filartiga argues for jurisdiction over torture in a foreign state partly on the grounds that torture violates Paraguayan law, and mistakenly analogizes torturers to pirates.[62] But the plaintiffs here do not plead that Rio Tinto violated Papua New Guinean law. We have absolutely no indication in the record or in the majority decision of how the sovereign state of Papua New Guinea interprets its laws as applied to Rio Tinto’s activities. We do not even have a clear decision on who is the sovereign authority in the relevant area, since that is a delicate matter between the government of Papua New Guinea and the newly autonomous government of Bougainville.
The Second Circuit now acknowledges that “the class of crimes subject to universal jurisdiction traditionally included only piracy.”[63] The only wrong the First Congress could have possibly contemplated as providing for universal jurisdiction would have been piracy.[64] But imaginative speculation about how legislators in 1789 may have felt about piracy cannot expand the Alien Tort Statute’s reach to entirely foreign disputes that bear no relation whatsoever to piracy.[65] Twenty-first-century preferences regarding universal jurisdiction and war crimes do not shed light on the congressional intent underlying an *808 eighteenth-century statute.[66]
III. Absence of Affirmative Intent Clearly Expressed.
Sosa adds another reason why courts must be especially restrained in expanding the meaning of the “law of nations”: the political nature of the concerns raised. Sosa holds that there is a “high bar to new private causes of action for violating international law, for the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.”[67] Therefore, courts are required to be especially careful to not disregard the principle of equal sovereignty when interpreting statutes.[68]
Because of the delicacy of potential disruption of foreign relations, the rule is that a statute may be given extraterritorial effect only if Congress provides “clear expression” of an “affirmative intent.” “For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident... .”[69]
Of course, as with most principles, there are exceptions. The new heights of inhumanity achieved by Germany from 1933 to 1945 compelled a new look at the Westphalian principle.[70] The law of nations, as currently understood, does indeed allow interference with another nation’s sovereignty to prevent certain wrongs, such as genocide and slavery.[71] Even for genocide and slavery, the decision whether to afford remedies rests with the executive and legislative branches. Our government may, consistently with the law of nations, remedy such violations, but that does not imply equal authority in the courts, in the absence of clear expression by the political branches to confer that authority. Sometimes the political organs of government make political decisions to do nothing, as with genocide in Rwanda and slavery in the Sudan in recent years. The bedrock principle of equality of sovereignty is not an absolute prohibition on government vio *809 lation of another country’s sovereignty, but it does impose a strong presumption against inferring judicial authority from a statute not clearly expressing an intent to confer it. The Court has characterized this presumption against extraterritoriality as “[t]he presumption that United States law governs domestically but does not rule the world.[72]
That the law of nations may be violated is necessary but not sufficient for jurisdiction. Even assuming that the presumption against extraterritoriality is rebuttable and that the complaint sufficiently pleads violations of the law of nations by Rio Tinto, we still lack the clear expression of an affirmative intent by Congress sufficient to enable the judiciary to act in violation of the principle of equal sovereignty. “Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.”[73] Consequently, even if the law of nations, the General Assembly of the United Nations, and the United Nations Security Council were to authorize “all necessary measures” [74] against Papua New Guinea and Rio Tinto for depredations in Bougainville (which they have not), a federal court would still need a congressional grant of jurisdiction under Article III to join the crusade. That grant of jurisdiction is lacking in this case, because the Alien Tort Statute does not clearly express an intent that it should be applied within the territory of another sovereign nation where there is no American connection.
Morrison reaffirms the long-standing canon of construction against implied extraterritoriality: “When a statute gives no clear indication of an extraterritorial application, it has none.”[75] Since the Alien Tort Statute gives no such “clear indication,” it has no application to “foreign-cubed” cases such as this one. The statute does not say or imply “wherever such violation may occur.” The authority of American courts does not generally extend to all heinous wrongs committed by anyone, against anyone, anywhere in the world. That is so even if the wrongs are so heinous that no civilized person could think them tolerable, and even if the wrongs violated the law of nations and could justify a legislative and executive decision to remedy them.
Ambiguous statutory language is not enough to get around Morrison’s “bright *810 line rule”[76] and the Charming Betsy canon of construction. F. Hoffmann-LaRoche Ltd. v. Empagran S'.A[77] holds that federal courts should “ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations.”[78] In Hoffmann-LaRoche, the statute could be read to apply in favor of class-action plaintiffs alleging anticompetitive conduct by foreign companies affecting foreign purchasers. But the Court held that it could not be read to apply extraterritorially.[79] Likewise, even though the Alien Tort Statute does not expressly prohibit application to foreign-cubed wrongs, we may not apply it “to foreign conduct insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiffs claim....”[80] The majority acts contrary to Sosa, Morrison, and Hoffmann-LaRoche.
We can see from other statutes what “clear indication^]” of extraterritorial application look like. The Torture Victim Protection Act of 1991 gives the district courts jurisdiction over aliens’ claims for torture and extrajudicial killing. The clearly expressed intent that it apply ex-traterritorially is its requirement of exhaustion of remedies “in the place in which the conduct giving rise to the claim occurred.” [81] This is “a clear mandate ... providing authority that ‘establish[es] an unambiguous and modern basis for’ federal claims of torture and extrajudicial killing.” [82] Sosa goes out of its way to reject any general implication that “other norms that already exist or may ripen in the future into rules of customary international law” provide a basis for jurisdiction over lawsuits: “Congress as a body has done nothing to promote such suits.”[83]
Likewise, the Foreign Corrupt Practices Act prohibits foreign companies listed on an American stock exchange from “corruptly do[ing] any act outside the United States” in furtherance of foreign bribery.[84] The language “outside the United States” plainly and expressly provides for extraterritorial application. No such language suggesting extraterritorial application was included in the Alien Tort Statute. Congress has from time to time amended the Alien Tort Statute, but has refrained from adding any expression of an intent that it apply extraterritoriality.[85]
*811 The majority infers a “clear indication” of applicability inside the territory of foreign countries from (1) jurisdiction over claims by non-citizens, (2) reference to the law of nations, which sounds international, and (3) applicability to piracy.[86] None of these support the inference. The first merely addresses claims arising from conduct within American territory, such as the assault by a French citizen against a French consul in Philadelphia in the Marbois affair. The second refers to the source of law, “the law of nations,” not the location of the wrong. The third, piracy, is addressed below. There is no superfluity in granting a federal remedy for torts within the United States that state courts and federal courts might otherwise be unable to address.[87]
The advisory opinion by Attorney General William Bradford cited by Judge McKeown does not support a contrary view. Attorney General Bradford’s opinion related to the Jay Treaty, so it concerned the Alien Tort Statute’s treaty provision, not, as in this case, the “law of nations.” And it spoke to Americans’ actions abroad, not foreign-cubed cases such as this. The treaty required punishment of American citizens acting on commission from enemies of Great Britain (France) against British subjects.[88] Had federal courts denied alien plaintiffs a venue for the actions committed in violation of the law of nations by Americans abroad, the denial would have resulted in “denial of justice” justifying reprisals, which was what the First Congress intended to avoid.[89] Attorney General Bradford’s opinion does not support federal jurisdiction under the Alien Tort Statute for foreign-cubed cases.[90]
To give a “clear indication” of extraterritorial application, the statute would have to address where the tort was committed. It merely addresses what may constitute the tort, and gives no indication, let alone a clear expression of one, that the federal courts were to wield their swords in foreign countries for wrongs having nothing to do with our new country. Morrison implicitly rejects the Second Circuit’s “disregard of the presumption against extraterritoriality” and the misguided belief that it is “left to the eourt[s] to ‘discern’ whether Congress would have wanted the statute to apply” if a statute “is silent as to ... extraterritorial application.”[91]
IV. Piracy.
I have assumed for purposes of discussion that the complaint alleges violations of the law of nations, but do not mean to suggest that it really does. The Court held in Sosa v. Alvarez-Machain that “federal courts should not recognize private claims under federal common law [in the context of the Alien Tort Statute] for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the Alien Tort *812 Statute] was enacted.”[92] The Court delineated this “narrow set of violations”[93] as “Blackstone’s three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy.”[94] Nothing like these three torts is pleaded. The Court left open the possibility of stepping out of this “narrow set,”[95] but cautioned that “[s]ince many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.”[96] The required “great caution” is absent from the majority’s invitation to class action tourists seeking to litigate entirely foreign wrongs.[97]
One of the three violations of the law of nations laid down by Blackstone, as noted in Sosa, was piracy.[98] This is an extraterritorial wrong cognizable under the Alien Tort Statute. Sosa holds that Congress meant to include piracy in the statute because piracy gave rise to actionable private claims for violation of the law of nations in the eighteenth century.[99] That does not support an inference that other heinous conduct was included.
There are two kinds of extraterritoriality: conduct outside the territory of any state, and conduct outside our territory but within the territory of another state. Piracy, by definition, falls within the first, not the second, kind of extraterritoriality. It occurs outside the territory of any state, so any state can grant a remedy without impinging on the sovereignty of another state. Though some wrongs are as abhorrent as piracy, and some are considerably worse, that does not imply that wrongs as bad as or worse than piracy may be remedied when they occur in a foreign state. “[U]niversal jurisdiction is accepted in cases of piracy because piracy is carried out on the high seas, outside all State territory” so it is traditionally the “one case of universal jurisdiction.”[100] The extraterritoriality of the wrong is why universal jurisdiction has always applied to piracy,[101] and why it is a sui generis exception to the presumption against extraterritoriality.[102]
*813 Piracy was not, when the Alien Tort Statute was promulgated, and is not now, considered morally heinous beyond other crimes. It consists of robbery, kidnapping, murder, and related felonies committed on the high seas.[103] Blackstone said that piracy consists of “those acts of robbery and depredation upon the high seas which, if committed upon land, would have amounted to felony there.”[104] “[P]irates have always been compared to robbers. The only difference between them is, that the sea is the theatre of action for the one, and the land for the other.” [105] Piracy’s defining characteristic is not its heinousness, but that it occurs outside any nation’s sovereign territory.[106] All states have concurrent jurisdiction over piracy on the high seas, and no state has sovereignty over the high seas, so any state may act against pirates without violating the sovereignty of any other.[107]
The First Congress defined piracy in 1790, a year after promulgating the Alien Tort Statute, as “murder or robbery, or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death” as long as it was committed “upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state.”[108] The phrase “out of the jurisdiction of any state” is the critical element of the crime for purposes of extraterritorial applicability. The current version of this statute likewise criminalizes “piracy, as defined by the law of nations” when committed “on the high seas.”[109]
That the location, and not the heinousness, is what justifies universal jurisdiction should be obvious even without knowledge of the traditional understanding that “piracy was listed as the only universally cognizable offense.”[110] If a gang of Somalis takes control of a ship on the high seas, holding the ship, its crew, and its passengers for ransom, forcibly taking the passengers’ property and killing its captain, they have committed piracy and federal courts in the United States may exercise criminal and civil jurisdiction.[111] Now suppose the very same Somali gang assembles in Rotterdam, takes over a Dutch factory, kills the factory manager, and holds the Dutch factory workers for ransom and takes their property. The law of nations provides for universal jurisdiction over the gang when they act on the high seas, but *814 not when they act in Rotterdam. Despite committing the same crimes as when they were pirates on the high seas, the gang cannot be prosecuted in the United States for their crimes in Rotterdam. To do so would itself be an American violation of the law of nations, because our prosecution (which might include capital punishment, abhorred by the Dutch) would impinge on Dutch sovereignty.[112] “The courts of no country execute the penal laws of another.” [113]
V. Injudicious Imperialism.
Our decision makes the Ninth Circuit the best place in the world to bring class actions against deep-pocket private defendants to recover compensatory and punitive damages and attorneys’ fees for the evils so prevalent all over the world. This claim of supervisory authority over the entire planet is unwise as well as legally incorrect.
First, as has already been addressed, our decision has no support in the law of nations. On the contrary, our decision undermines it. Even the Second Circuit would dismiss this case.[114] When the District of Columbia Circuit faced some of the same questions for foreign-eubed human rights claims in Tel-Oren v. Libyan Arab Republic[115] and Ali Shafi v. Palestinian Authority,[116] all three judges on each panel agreed that the suit was properly dismissed for lack of jurisdiction, albeit on differing grounds. The fractured opinions when circuit courts, ours and others, address extraterritorial jurisdiction under the Alien Tort Statute are themselves strong evidence of the absence of any established body of useful precedent.[117] No other circuit has opened the door so wide as we now do for private tort actions for wrongs by foreigners, to foreigners, in foreign lands. Our course is contrary to the “vigilant doorkeeping” that Sosa v. Alvarez-Mackain requires.[118] We may use forum non conveniens in the future to limit the harm,[119] but we have no authority to exercise jurisdiction at all.
*815 Second, the majority confuses what the United States may properly do under customary international law with what the First Congress gave American courts jurisdiction to do. The United States may, in accord with contemporary views of international law, act in other states’ sovereign territory against many human rights violations, such as genocide.[120] Congress may have authority to confer universal jurisdiction over some foreign-cubed human-rights violations, and has done so with respect to torture.[121] It is careless error, though, to infer that anything the elected branches may do, a court has jurisdiction to do. Whether Congress may, consistently with the law of nations, grant universal jurisdiction to a federal court is a different question from whether it has done so. The majority misses that distinction.[122] In foreign affairs, the error is not only careless but dangerous.
The Constitution gives the power to “define and punish” violations of the law of nations, and the power to define the jurisdiction of federal courts, to Congress.[123] That the United States government may properly act to stop genocide in a foreign country does not imply that a federal district court may enjoin foreign genocide and then send in the marshals to enforce the injunction by force, or award damages. Yet the complaint asks us to issue an injunction regulating environmental remediation in Papua New Guinea, and to award damages for claimed human-rights violations there, regardless of what the governments of Papua New Guinea or the United States would find appropriate.
Exercise of jurisdiction over alleged wrongs committed by foreigners against foreigners in a foreign country dangerously interferes with decisions properly made only by the political branches of our government. Such claims are properly classed as raising nonjusticiable political questions. United States v. Palmer holds that questions regarding the rights of a part of a foreign state seeking its independence are “delicate and difficult” and “such questions are generally rather political than legal in their character.” [124] In the case before us, the claims arise out of a civil war in which Bougainville sought to secede from Papua New Guinea. Palmer held that such questions as are before us belong more properly to those “who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; to whom are entrusted all its foreign relations; than to a tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it.” [125]
The political branches may choose to take no action against terrible evils to preserve essential alliances, as they did with respect to the Soviet Union during World War II; to avoid entanglements *816 that would cost blood and money despite the justice of the cause, as with the Rwandan genocide; to avoid giving offense to regimes whose votes are useful to us in the United Nations or whose disinvestment in treasury securities would damage our economy; and to avoid ejection of our military bases from foreign territory if we characterized their history in an offensive manner, as with the Armenian genocide by Turkey. These political decisions are not pretty, but they are an integral part of the management of foreign affairs, and this task is for good reasons not assigned to the judiciary.
Third, judicial decisions on entirely foreign matters are likely to be mistaken because of the inadequate reliability of factual determinations. American courts decide cases by applying general legal principles to highly particularized historical facts.[126] A just decision requires a reasonably high degree of accuracy in the factual determination. Papua New Guineans speak hundreds of languages, which few federal judges or certified translators in America are likely to know. Conduct there occurs in what is for us an extremely exotic context. Things that every Papua New Guinean knows are unknown to us, and we are likely to be excessively dependent on what one or a few anthropologists tell us. Nor are we likely to understand the Papua New Guinean factual, historical, and legal context, a necessity if we are to judge the right and wrong of conduct that occurred there. The incapacity of American courts to ascertain facts about what foreigners did to foreigners in a foreign land, combined with the amorphousness of the general principles of law to be applied, can only lead to unreliable, unpredictable, and unjust results.
And suppose the district court were to award judgment for a huge sum from Rio Tinto for distribution to the several Papua New Guinean classes designated in the complaint. After we assign part of it to counsel as attorneys’ fees, how shall the district court effectively and justly supervise distribution to the proper Papua New Guineans in proper amounts? Justice requires accuracy and fairness in dividing up the winnings, not just assigning the blame and imposing the losses. These foreign-cubed cases may generate publicity and settlements,[127] but the logistics of an actual trial and management of remedies in a federal district court are impracticable and not subject to just application.
Fourth, once we release the genie of universal jurisdiction- from the bottle, we cannot control for whom the genie works its magic. Other countries with different values are likely to use universal jurisdiction against us. There could be a class action, perhaps in Papua New Guinea, brought by a Cherokee against descendants of those who obtained Cherokee land when President Jackson’s administration forced their ancestors to leave their homes for the West. A foreign court could entertain a class action on behalf of African-Americans against American banks whose corporate ancestors profited from interest on loans for the purchase of American slaves. The law of nations provides no statute of limitations for universal offenses, so these class actions might well be cognizable in foreign courts.[128] Why *817 should descendants of those who have suffered great wrongs in America limit themselves to largely unavailable American remedies when foreign courts may be more advantageous?
Universal jurisdiction has already been asserted, by Iran, for blasphemy. Here is the 1989 edict by the Ayatollah of Iran against Salman Rushdie:
I inform all zealous Muslims of the world that the author of the book entitled The Satanic Verses—which has been compiled, printed, and published in opposition to Islam, the Prophet, and the Koran—and all those involved in the publication who were aware of its contents are sentenced to death.
I call upon all zealous Muslims to execute them quickly, wherever they may be found, so that no one else will dare to insult the Muslim sanctities. God willing, whoever is killed on this path is a martyr.
In addition, anyone who has access to the author of this book but does not possess the power to execute him should report him to the people so that he may be punished for his actions.[129]
Rushdie’s blasphemy is constitutionally protected in the United States, but not in Iran, and not in numerous other countries.[130] Imposition of Iranian law on Rushdie in the United States would violate the most fundamental aspect of our sovereignty—our constitutional right to freedom of speech—but if we can exercise universal jurisdiction over what we imagine violates the law of nations, why not Iran? Though the traditional formulation limits the law of nations to the usage of “civilized communities” [131] or “civilized and Christian nations,” [132] those limitations are not likely to be persuasive to the excluded nations.
Fifth, and most important, our judicial exercise of jurisdiction with no American nexus is profoundly illegitimate. Papua New Guinea is a small country compared to ours, but a separate one entitled to be governed by its own people. Rio Tinto is a British-Australian company, properly governed by the laws of the United Kingdom and Australia, and, to the extent it acts in Papua New Guinea, by Papua New Guinea. When Congress passed the Alien Tort Statute in 1789, it would have been inconceivable that courts might use the statute to impose our notions of right and wrong on entirely foreign conduct in foreign lands, because our country was far too small and weak to risk provoking the hostility of any foreign power.[133] It is unimaginable that the First Congress meant to provide for tort suits in American courts by and against Frenchmen in case the French Revolution descended into the Terror, yet today’s interpretation so construes the statute. The First Congress, remembering well our objection to British imposition of authority from across the Atlantic upon us, would not have thought it proper *818 for federal courts to do the same to others across the Pacific.
The judicial imperialism inherent in the exercise of universal jurisdiction threatens harm to the very people meant to be helped. For example, there can be no serious question that apartheid in the former Union of South Africa was a terrible wrong and that eliminating it was a great accomplishment for justice. But when the Second Circuit opened the door to class actions for damages resulting from apartheid,[134] post-apartheid South African President Thabo Mbeki “considered] it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country....”[135] Black South Africans had their own process for dealing with the great injustice of apartheid without destroying their country. Papua New Guinea and Bougainville have suffered through a ruinous civil war that lasted for nearly a decade. However they decide to work out their reconstruction and reconciliation, that delicate process should not be distorted by our heavy, ignorant, and foreign hand.
“[J]udges ought to be exposed to the society in which the consequences of their ruling will fall, as a control on the indifferent, the frivolous, and the rigid, and an assurance that decision is taken only in conditions of full investment.” [136] When judges are not part of the society they judge, there is nothing to offset the temptation towards grandiose moral posturing, attractive to people who judge disputes in societies where they have no stake. Imposition of our own moral judgments onto foreigners in foreign lands is imperialism by courts instead of gunboats, and is just as wrong.
Conclusion
Assaulting an ambassador unquestionably violates the law of nations and constitutes an actionable tort under the Alien Tort Statute. Perhaps some of the wrongs alleged in the complaint do as well, though the judges in the majority cannot agree on which ones. But a United States federal district court lacks jurisdiction to entertain a tort action even for so plain a violation of the law of nations as an assault on an Australian ambassador by a Papua New Guinean in Bougainville. Congress has not provided for application of the Alien Tort Statute, conferring jurisdiction over “a tort only in violation of the law of nations,” on torts committed by foreign nationals in foreign countries against foreign nationals.
This case calls for judicial humility. Instead, we arrogate to ourselves imperial authority over the whole world.
This case should be dismissed.

. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 165, 2 L.Ed. 60 (1803).

. The claims are: (1) crimes against humanity amounting to genocide, by encouraging the Papua New Guinea government in their blockade of Bougainville; (2) war crimes, by cooperating with Papua New Guinea in violence against civilians; (3) violating the universal right to life by appropriating land, emitting toxic mine waste, and otherwise damaging the environment of Bougainville; (4) discriminating by race, in that these wrongs were committed with a mentality of regarding Bougainvilleans as inferior because of the color of their skin, and Rio Tinto hired numerous outsiders and paid them more than Papua New Guineans; (5) engaging in cruel, inhuman, and degrading treatment of the people of Bougainville; (6) violating international rights to a healthy environment; (7) engaging in a systematic pattern of these violations of human rights; (8) negligently manufacturing and disposing of tailings, chemicals, and toxic effluents; (9) creating a public nuisance to health; (10) creating a private nuisance by impairing the use of Bougainvilleans’ land; (11) strict liability for using defective technology for mining, leading to pollution; (12) injunctive relief to remedy the environmental harms; and (13) entitlement to the costs of medical monitoring for those exposed to the pollutants. This is a class action, seeking certification of a "War Crimes Class,” an "Environmental Right to Life Class,” and a "Medical Monitoring Class.”

. 28 U.S.C. § 1350. In its original, materially similar language, the statute provided that federal courts "shall ... have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.” 1 Stat. 80, ch. 20, § 9(b) (1789).

. Brief of the Governments of the United Kingdom of Great Britain and Northern Ireland and the Commonwealth of Australia as Amici Curiae in Support of the DefendantsAppellees/Cross-Appellants at 5 (Nos. 02-56256, 02-56390, 09-56381); see also John H. Herz, Rise and Demise of the Territorial State, 9 World Pol. 473, 480-81 (1957) ("[Ojnly to the extent that it reflected their territoriality and took into account their sovereignly could international law develop.... [Sovereign units must know in some detail where their jurisdictions end and those of other units begin; without such standards, nations would be involved in constant strife over the implementation of their independence.”).

. Morrison v. Nat’l Austl. Bank Ltd., —U.S. —, 130 S.Ct. 2869, 2885-86, 177 L.Ed.2d 535 (2010); see also Brief of the United Kingdom of Great Britain and Northern Ireland as Amicus Curiae in Support of Respondents at 2, Morrison v. Nat’l Austl. Bank Ltd., 130 S.Ct. 2869 (2010) (No. 08-1191) (‘‘The risk of infringing upon the sovereignty of other nations is a particular concern with respect to ... cases involving foreign purchasers, a foreign issuer, and alleged harm suffered in transactions on a foreign securities exchange (so-called ‘foreign-cubed’ securities cases).”); Brief of the Government of the Commonwealth of Australia as Amicus Curiae in Support of the Defendants-Appellees at 1-2, Morrison v. Nat'l Austl. Bank Ltd., 130 S.Ct. 2869 (2010) (No. 08-1191) (arguing that Australia "is opposed to overly broad assertions of extraterritorial jurisdiction over aliens arising out of foreign disputes, because such litigation can interfere with national sovereignty and result in legal uncertainty”).

. See Morrison, 130 S.Ct. at 2886-88.

. See, e.g., Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 38, 44 (Feb. 14) (separate opinion of Pres. Guillaume); R v. Bartle, ex parte Pinochet ligarte, [2000] 1 A.C. 61 (H.L.) 79 (Lord Slynn of Hadley, dissenting) (appeal taken from Q.B. Div'l Ct.) (U.K.), reprinted in 37 I.L.M. 1302, 1312-13 (1998) ("It does not seem to me that it has been shown that there is any State *800 practice or general consensus let alone a widely supported convention that all crimes against international law should be justiciable in National Courts on the basis of the universality of jurisdiction.... That international law crimes should be tried before international tribunals or in the perpetrator’s own state is one thing; that they should be impleaded without regard to a long-established customary international law rule in the Courts of other states is another.... The fact even that an act is recognised as a crime under international law does not mean that the Courts of all States have jurisdiction to try it.... There is no universality of jurisdiction for crimes against international law....”).

. The statute preceded France's reacquisition of the territory from Spain and preceded the Louisiana purchase.

. The Federalist No. 3, at 14-15 (John Jay) (Jacob E. Cooke ed., 1961).

. Id. at 16.

. James Renwick, The Life and Work of Gladstone 30-31 (1905); See Alwyn V. Freeman, The International Responsibility of States for Denial of Justice 1, 19-20 (1938).

. The Federalist No. 80, at 534-36 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

. See Sosa v. Alvarez-Machain, 542 U.S. 692, 716-17, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. Respublica v. De Longchamps, 1 Dall. 111, 111-12, 1 L.Ed. 59 (Pa. 1784); Letter from Thomas Jefferson to Charles Thomson (May 21, 1784), reprinted in IV The Works of Thomas Jefferson 363 (Paul Leicester Ford ed. 1894).

. See E. de Vattel, The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns, bk. IV, §§ 80-82, at 371-72 (photo. reprint 1993) (Charles G. Fenwick trans., Carnegie Inst, of Wash., 1916) (1758).

. See Sosa, 542 U.S. at 717, 124 S.Ct. 2739.

. Id.

. See 34 Journals of the Continental Congress, 1774-1789, at 109 (Roscoe R. Hill ed., 1937).

. Vattel, The Law of Nations, bk. II, § 350, at 230 (noting that "reprisals should only be resorted to when justice can not be otherwise obtained.... Justice may be refused in several ways: (1) By an outright denial of justice or by a refusal to hear the complaints of a State or of its subjects or to allow the subjects to assert their rights before the ordinary tribunals” (emphasis added)); see also H.W. Halleck, International Law, ch. XII, § 11, at 297 (photo, reprint 2000) (1861) (noting how, in situations like those described by Vattel, "the government of the injured [foreigner] may ... demand justice, and if it be refused, resort to reprisals.... Subjects must submit to the authority of the law, however great the injustice, but foreigners are under no such obligation, for their own state may, by force, compel the execution of justice on their behalf”).

. Transcript of Oral Argument at 40 (Question of Justice Stevens), Sosa v. Alvarez-Ma-chain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (No. 03-339), available at http://www.supremecourt.gov/oral_ arguments/argument_transcripts/03-339.pdf; cf. Doe v. Exxon Mobil Corp., 654 F.3d 11, 77 (D.C.Cir.2011) (Kavanaugh, J., dissenting) ("It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in [a] U.S. court for, say, a Frenchman injured in London.”).

. See William Blackstone, 4 Commentaries *67-68 ("But where the individuals of any state violate this general law [of nations], it is *802 then the interest as well as duty of the government, under which they live to animadvert upon them with becoming severity, that the peace of the world may be maintained. For in vain would nations in their collective capacity observe these universal rules, if private subjects were at liberty to break them at their own discretion, and involve the two states in a war. It is therefore incumbent upon the nation injured, first, to demand satisfaction and justice to be done on the offender by the state to which he belongs; and, if that be refused or neglected, the sovereign then avows himself an accomplice or abettor of his subject’s crime, and draws upon his community the calamities of foreign war." (emphasis added)); see also De Longchamps, 1 Dali, at 117 (paraphrasing Blackstone, "You then have been guilty of an atrocious violation of the law of nations; you have grossly insulted gentlemen, the peculiar objects of this law (gentlemen of amiable characters, and highly esteemed by the government of this State) in a most wanton and unprovoked manner: And it is now the interest as well as duty of the government, to animadvert upon your conduct with a becoming severity, such a severity as may tend to reform yourself, to deter others from the commission of the like crime, preserve the honor of the State, and maintain peace with our great and good Ally, and the whole world." (emphasis added)); Vattel, The Law of Nations, bk. II, §§ 343, 347-50; Letter from Thomas Jefferson to James Madison (May 25, 1784), reprinted in IV The Works of Thomas Jefferson 365 (Paul Leicester Ford ed.1904).

. John M. Rogers, The Alien Tort Statute and How Individuals "Violate” International Law, 21 Vand. J. TransnatT L. 47, 47 (1988) (“Congress meant to grant federal jurisdiction over cases in which an individual has committed a tortious act in the United States which, if unredressed, would result in international legal responsibility on the part of the United States.”).

. Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L.Rev. 830, 881 (2006) ("[S]uit in domestic court for tort remedies by an alien against the one who injured his person or property was mainly a political expedient premised on the host sovereign’s hope that if the alien received a speedy and fair remedy, the other sovereign might not be informed of, or act upon, the safe-conduct breach, diminishing the risk that the offended sovereign would exercise its lawful right to make war.”).

. Ali Shafi v. Palestinian Auth., 642 F.3d 1088, 1099 (D.C.Cir.2011) (Williams, J., concurring); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 783 (D.C.Cir.1984) (Edwards, J., concurring) ("There is evidence ... that the intent of [the Alien Tort Statute] was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis.”).

. Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804).

. Id.; see also Sena v. Lappin, 600 F.3d 1191, 1198 (9th Cir.2010) (noting how "the purpose of the Charming Betsy canon is to avoid the negative ‘foreign policy implications' of violating the law of nations” (quoting Weinberger v. Rossi, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982))); United States v. Corey, 232 F.3d 1166, 1179 n. 9 (9th Cir. 2000) (highlighting how, under the doctrine, “[c]ourt[s] interpret!] ... [a] statute so as to avoid embroiling the nation in a foreign policy dispute unforeseen by either the President or Congress”).

. Charming Betsy, 6 U.S. (2 Cranch) at 120-21.

. Id.; Curtis A. Bradley, The Charming Betsy Canon and Separation of Powers: Rethinking the Interpretive Role of International Law, 86 Geo. LJ. 479, 489 (1998) (“[C]ourts often invoke the Charming Betsy canon as a reason for construing ambiguous statutes as not having extraterritorial effect.”).

. See Robert H. Jackson, Quasi-States: Sovereignty, International Relations, and the Third World 6 (1990) (“The grundnorm of such a political arrangement (sovereign statehood) is the basic prohibition against foreign intervention which simultaneously imposes a duty of forbearance and confers a right of independence on all statesmen.”).

. See, e.g., Louis Henkin, International Law: Politics and Values 29 (1995); Developments in the Law—Extraterritoriality, 124 Harv. L.Rev. 1226, 1280 (2011) (“Traditionally, a state may exercise prescriptive jurisdiction over only three types of conduct: conduct that takes place within its territory, conduct of its nationals, , and foreign conduct meant to have an effect within its territory or directed against its security. Any other application of a state’s domestic law abroad is considered a violation of international law; states are supposed to respect each other's exclusive authority to regulate behavior within their territorial boundaries.” (citations omitted)).

. Restatement (Third) of Foreign Relations Law § 206(a) (1987).

. Id. at § 404 cmt. b.

. See Restatement (Third) of Foreign Relations Law pt. IV, ch. 1, introductory note at 235 (1987) ("International law has long recognized limitations on the authority of states to exercise jurisdiction to prescribe in circumstances affecting the interests of other states.”); Restatement (Second) of Foreign Relations Law § 8 (1965) ("Action by a state in prescribing or enforcing a rule that it does *804 not have jurisdiction to prescribe or jurisdiction to enforce, is a violation of international law....").

. See id. at § 402; cf. U.N. Charter art. 2. para. 7 ("Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any state....”); William R. Slomanson, Fundamental Perspectives on International Law § 5.1, at 240 (6th ed.2011).

. At the core of Westphalian sovereignty are the twin legal principles of rex est imperator in regno suo ("the king rules as an emperor in his own realm”), see Daniel H. Nexon, Discussion: American Empire and Civilizational Practice, in Civilizational Identity 112 (Martin Hall & Patrick Thaddeus Jackson eds., 2007), and cuius regio, eius religio (“each king determines the religion of his realm”), which were the fundamental bases of international law in the eighteenth century. See James Mayall, World Politics 14-16 (2000); Kalevi J. Holsti, Peace and War 34-35 (1991).

. Island of Palmas (Neth. v. U.S.), 2 R.I.A.A. 829, 838 (Perm. Ct. Arb.1928) ("Sovereignty in the relations between States signifies independence. Independence in regard to a portion of tire globe is the right to exercise therein, to the exclusion of any other State, the functions of a State. The development of the national organisation of States during the last few centuries and, as a corollary, the development of international law, have established this principle of the exclusive competence of the State in regard to its own territory... .”); cf. also Corfu Channel (U.K. v. Alb.), 1949 I.C.J. 4, 35 (Apr. 9) ("Between independent States, respect for territorial sovereignty is an essential foundation of international relations.”).

. The Antelope, 23 U.S. (10 Wheat.) 66, 122, 6 L.Ed. 268 (1825).

. The Schooner Exch. v. McFaddon, 11 U.S. (7 Cranch) 116, 137, 3 L.Ed. 287 (1812).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 714-16, 723-24, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. See U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 462 n. 12, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978) (citing 1 J. Kent, Commentaries on American Law 18 (1826)) ("The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.”); see also Restatement (Third) of Foreign Relations Law, pt. I, ch. 1, reporters' note at 21 (1987).

. See, e.g., E. de Vattel, The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns, bk. I, § 245, at 96 (photo, reprint 1993) (Charles G. Fenwick trans., Carnegie Inst, of Wash., 1916) (1758).

. United States v. the La Jeune Eugenie, 2 Mason 409, 26 F.Cas. 832, 847 (C.C.D.Mass. 1822) (No. 15,551) (Story, J.).

. See, e.g., Guatemala Genocide Case, STC, Sept. 26, 2005 (S.T.C. No. 237/2005, § II) (Spain).

. See, e.g., Juzgado Central de Instruccion N 6, Audiencia Nacional, Madrid (Spanish High Court), decision (auto) of 13 April 2011, Preliminary Investigations (diligencias previas) 134/09-N (Spain), at 1.

. Compare Arrest Warrant of 11 Apr. 2000, 2002 I.C.J. at 77 (joint separate opinion of Higgins, Kooijimans, and Buergenthal, JJ.); Jones v. Kingdom of Saudi Arabia, [2006] UKHL 26, paras. 20, 22, [2007] 1 A.C. 270, 286-87 (Lord Bingham of Cornhill) (appeal taken from Eng.); Bouzari v. Islamic Republic of Iran (2004), 71 O.R.3d 675, paras. 93-94 (Can. Ont. C.A.) (rejecting a foreign-cubed civil case for torture by Iranian agents, noting that "[t]he peremptory norm of prohibition against torture does not encompass the civil remedy contended for by the appellant”), with Ferrini v. Repubblica Federale di Germania, Cass., sez. un., 11 mar. 2004, n. 5044, para. 9 (It.), reprinted in 87 Rivista di Diritto Internazionale 539, 546 (2004); Prefecture of Voiotia v. Federal Republic of Germany, Areios Pagos [A.P.] [Supreme Court] 11/2000 (Greece).

. Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980).

. Id. at 885.

. Id.

. Mostyn v. Fabrigas, 98 Eng. Rep. 1021, 1027, 1 Cowp. 161 (K.B. 1774) (on appeal from Court of Common Pleas) (Lord Mansfield).

. Id. at 1022.

. Id. at 1028.

. Id.

. Id. at 1030.

. 194 U.S. 120, 126-27, 24 S.Ct. 581, 48 L.Ed. 900 (1904).

. See Torture Victim Protection Act of 1991, Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

. I recognize that the reasoning of Filartiga has recently been followed, I think mistakenly, by the majority in Doe v. Exxon Mobil Corp., 654 F.3d 11 (D.C.Cir.2011), and by the Seventh Circuit in Flomo v. Firestone Natural Rubber Co., LLC, 643 F.3d 1013 (7th Cir. 2011). Although I disagree with such reasoning, both decisions provide inadequate support for the plaintiffs in this case, because neither was foreign-cubed.

. Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 77 (Feb. 14) (joint separate opinion of Higgins, Kooijimans, and Buergenthal, JJ.) (“Under the Alien Tort [Statute], the United States ... has asserted a jurisdiction both over human rights violations and over major violations of international law, perpetrated by non-nationals overseas.... While this unilateral exercise of the function of guardian of international values has been much commented on, it has not attracted the approbation of States generally.” (emphasis added)).

. Jones v. Kingdom of Saudi Arabia, [2006] UKHL 26, para. 63, [2007] 1 A.C. 270, 298 (Lord Hoffman) (appeal taken from Eng.).

. Id. at paras. 58, 99 (echoing the criticism of Judges Higgins, Kooijimans, and Buergenthal of the International Court of Justice by characterizing Filartiga as "a unilateral extension of jurisdiction by the United States”).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 728, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. Id. at 730, 124 S.Ct. 2739.

. Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir. 1980).

. United States v. Yousef, 327 F.3d 56, 104 (2d Cir.2003).

. United States v. Layton, 509 F.Supp. 212, 223 (N.D.Cal.1981) ("[Universal] jurisdiction had its origins in the special problems and characteristics of piracy. It is only in recent time that nations have begun to extend this type of jurisdiction to other crimes.”); compare Restatement (Second) of Foreign Relations Law § 404 (1965) (including piracy as the only universally cognizable offense), with Restatement (Third) of Foreign Relations Law § 404 (1987) (listing several other offenses, such as war crimes, the slave trade, and apartheid, as "universal”); see also R v. Bow St. Metro. Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3), [2000] 1 A.C. 147 (H.L.) (appeal taken from Q.B. Div’l Ct.) (U.K.), reprinted in 38 I.L.M. 581 (1999) (holding that it was the United Kingdom's ratification of the Convention Against Torture in 1988 that allowed for the acts of torture committed under Pinochet to be extraditable offenses, and not necessarily a jus cogens peremptory norm before the date of the convention's ratification).

. Bauman v. DaimlerChrysler Corp., 644 F.3d 909 (9th Cir.2011), takes this mistaken course by conflating the intentions of the First Congress’s drafting of the Alien Tort Statute in 1789 with that of the 102nd Congress in 1992, codifying Filartiga's result in the Torture Victim Protection Act of 1991. Contra United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.”).

. See Minor v. Mechanics Bank of Alexandria, 26 U.S. (1 Pet.) 46, 64, 7 L.Ed. 47 (1828) ("But no general rule can be laid down upon this subject, further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment.” (emphasis added)); see also John 0. McGinnis, Foreign to Our Constitution, 100 Nw. U.L.Rev. 303, 307 n. 22 (2006) ("[Djefenders of the use of contemporary international law want to use evolving standards of an international law that has grown in scope to become a kind of local municipal law and changed in nature from natural to positive law. In this respect, modern international law does not resemble the law of nations known to the Framers.").

. Sosa v. Alvarez-Machain, 542 U.S. 692, 727, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. See Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 146-47, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957). In fact, the very hint of a federal court exercising universal jurisdiction in the early nineteenth century complicated our nation’s diplomacy with France. See United States v. the La Jeune Eugenie, 2 Mason 409, 26 F.Cas. 832, 840-41 (C.C.D.Mass. 1822) (No. 15,551) (Story, J.).

. Benz, 353 U.S. at 147, 77 S.Ct. 699.

. Arguably, though, the Nuremberg trials were consistent with equality of sovereignty, because, having destroyed the German government and replaced it with government by the Allies, the Allies were sovereign in Germany after the war.

. See Restatement (Third) of Foreign Relations Law § 404 (1987).

. Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007).

. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); See, e.g., Empire Health-choice Assurance, Inc. v. McVeigh, 547 U.S. 677, 696, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006).

. S.C. Res.1973, ¶ 4, U.N. SCOR, 66th Year, U.N. Doc. S/RES/1973, at 3 (Mar. 17, 2011).

. Morrison v. Nat'l Austl. Bank Ltd., __U.S. __, 130 S.Ct. 2869, 2878, 177 L.Ed.2d 535 (2010); see Smith v. United States, 507 U.S. 197, 203-04, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993); Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173-74, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); Astoria Fed. Sav. & Loan Ass’n v. Solimino, 501 U.S. 104, 109, 111 S.Ct 2166, 115 L.Ed.2d 96 (1991); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21-22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 146-47, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957); United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10, 94 L.Ed. 3 (1949); Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); United States v. Bowman, 260 U.S. 94, 97-98, 43 S.Ct. 39, 67 L.Ed. 149 (1922).

. Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 32 (2d Cir.2010) (per curiam).

. F. Hoffmann-LaRoche Ltd. v. Empagran S.A., 542 U.S. 155, 164, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004).

. Id.; see also ARC Ecology v. U.S. Dep’t of Air Force, 411 F.3d 1092, 1102-03 (9th Cir. 2005) ("[A]ccepting the appellants’ broad interpretation of the statute would be the equivalent of forcing the United States to encroach on the territory and affairs of another sovereign.").

. F. Hoffmann-LaRoche, 542 U.S. at 174, 124 S.Ct. 2359.

. Id. at 165, 124 S.Ct. 2359.

. Torture Victim Protection Act of 1991, Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 728, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting H.R.Rep. No. 102-367, pt. 1, p. 3 (1991), 1992 U.S.C.C.A.N. 84, 86).

. Id. In this respect, I disagree with the majority and its reliance on Doe v. Exxon Mobil Corp., 654 F.3d 11 (D.C.Cir.2011). The defendant in that case was an American corporation. It was not a foreign-cubed case, as this one is.

. Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-2.

. See Act of Mar. 3, 1911, ch. 231, § 24, 36 Stat. 1087, 1093 (1911); Rev. Stat. § 563 (1874).

. Maj. op. at 766-67.

. Flomo v. Firestone Natural Rubber Co., LLC, 643 F.3d 1013, 1019 (7th Cir.2011), errs in this respect.

. Compare Treaty of Amity, Commerce and Navigation, U.S.-Gr. Brit., arts. 21-22, 8 Stat. 116 ("Jay Treaty”) (ratified on June 24, 1795), .with 1 Op. Att'y Gen. 57, 58-59 (July 6, 1795).

. See Jay Treaty, 8 Stat. 116, art 22; Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L.Rev. 830, 881 n. 265 (2006).

. See Lee, The Safe-Conduct Theory, 106 Colum. L.Rev. at 881.

. Morrison v. Nat’l Austl. Bank Ltd.,__U.S.__, 130 S.Ct. 2869, 2877-78, 177 L.Ed.2d 535 (2010).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. Id. at 715, 124 S.Ct. 2739.

. Id. at 724-25, 124 S.Ct. 2739.

. Id. at 715, 124 S.Ct. 2739; see also id. at 762, 124 S.Ct. 2739 (Breyer, J., concurring).

. Id. at 727-28, 124 S.Ct. 2739.

. Cf. Ali Shafi v. Palestinian Auth., 642 F.3d 1088, 1094 (D.C.Cir.2011) ("[T]he proposition advanced by the appellants before us could open the doors of the federal courts to claims against nonstate actors anywhere in the world alleged to have cruelly treated any alien. To recognize such a sweeping claim would hardly be consistent with the standards of caution mandated by the Sosa Court.”).

. Sosa v. Alvarez-Machain, 542 U.S. 692, 715, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing William Blackstone, 4 Commentaries *68).

. Id. at 719, 124 S.Ct. 2739.

. Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belg.), 2002 I.CJ. 3, 37-38 (Feb. 14) (separate opinion of Pres. Guillaume).

. See United States v. Shi, 525 F.3d 709, 722-23 (9th Cir.2008).

. S.S. Lotus (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, at 70 (Sept. 7) (Moore, J., dissenting) (“Piracy by law of nations, in its jurisdictional aspects, is sui generis. Though statutes may provide for its punishment, it is an offence against the law of nations; and as the scene of the pirate's operations is the high seas, which it is not the right or duty of any nation to police, he is denied the protection of the flag which he may carry.... ”).

. United States v. Smith, 18 U.S. (5 Wheat.) 153, 176, 5 L.Ed. 57 (1820) (quoting William Blackstone, 4 Commentaries *71, 73).

. William Blackstone, 4 Commentaries *72; see also 2 M.D.A. Azuni, The Maritime Law of Europe, ch. V, § 3, at 351 (William Johnson trans., Isaac Riley & Co., 1806) (1795).

. Smith, 18 U.S. (5 Wheat.) at 163 n.h.

. Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 56 (Feb. 14) (declaration of Ranjeva, J.) ("[S]ince piracy by definition involves the pirates’ denial and evasion of the jurisdiction of any State system, the exercise of universal jurisdiction enables the legal order to be re-established. ... [T]he conferring of universal jurisdiction on national courts to try pirates and acts of piracy is explained by the harm done to the international system of State jurisdiction. The inherent seriousness of the offence has, however, not been deemed sufficient per se to establish universal jurisdiction.”).

. Smith, 18 U.S. (5 Wheat.) at 176; R v. Dawson, 8 William III, 1696, 13 How. St. Tr. 451, 455.

. 1 Stat. 113, ch. 9, § 8 (1790).

. 18 U.S.C. § 1651.

. Eugene Kontorovich, The Piracy Analogy: Modem Universal Jurisdiction’s Hollow Foundation, 45 Harv. Int'l L.J. 183, 184 n. 8 (2004).

. See United States v. Shi, 525 F.3d 709 (9th Cir.2008).

. See Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 43-44 (Feb. 14) (separate opinion of Pres. Guillaume).

. The Antelope, 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825).

. Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 120 (2d Cir.2010).

. Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984).

. Ali Shaft v. Palestinian Auth., 642 F.3d 1088 (D.C.Cir.2011)

. Compare id. at 1092 ("In short, the TelOren court ... provided support for the proposition that torture claims against nonstate actors were not within the jurisdictional grant of the A[lien] T[ort] S[tatute].... The relevant events between 1984 and today not only do not change our decision from the one entered in Tel-Oren, but support a continuation of that precedent.''), with Doe v. Exxon Mobil Corp., 654 F.3d 11, 19-29 (D.C.Cir.2011) (applying the Alien Tort Statute to nonstate actors for torture committed in Indonesia). The majority and Judge McKeown’s reliance on Doe, Maj. op. at 744-45, McKeown op. at 747-49, should be tempered by the fact that the defendant in that case, unlike the defendant in this case, was an American corporation.

. Sosa v. Alvarez-Machain, 542 U.S. 692, 729, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

. Loya v. Starwood Hotels, 583 F.3d 656, 665-66 (2009) (affirming dismissal for forum non conveniens against an American plaintiff suing an American defendant); cf. Bil’in (Vill. Council) v. Green Park Int’l Ltd., 2009 QCCS 4151 (Can. Qué. Sup.Ct.), para. 335, aff’d, 2010 QCCA 1455 (Can. Qué. C.A.) (dismissing a suit brought by residents of a village in the West Bank against a Canadian company constructing buildings there on forum non conveniens grounds because "the Plaintiffs have selected a forum having little connection with *815 the Action in order to inappropriately gain a judicial advantage over the Defendants and where the relevant connecting factors, considered as a whole, clearly point to the [Israeli High Court of Justice] as the logical forum and the authority in a better position to decide”).

. Restatement (Third) of Foreign Relations Law § 702 (1987).

. See Torture Victim Protection Act of 1991, Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note); Restatement (Third) § 404.

. See Morrison v. Nat’l Austl. Bank Ltd.,— U.S. —, 130 S.Ct. 2869, 2885-86, 177 L.Ed.2d 535 (2010).

. U.S. Const. art. I, § 8, cls. 9, 10.

. United States v. Palmer, 16 U.S. (3 Wheat.) 610, 634, 4 L.Ed. 471 (1818) (Marshall, C.J.).

. Id.

. See Kenneth Culp Davis, Facts in Lawmaking, 80 Colum. L.Rev. 931 938-42 (1980).

. See, e.g., Doe I v. Unocal Corp., 395 F.3d 932 (9th Cir.2002), reh'g en banc granted, 395 F.3d 978 (9th Cir.2003), dismissed, 403 F.3d 708 (9th Cir.2005).

. See Restatement (Third) of Foreign Relations Law § 404 cmt. a (1987) ("A universal offense is generally not subject to limitations of time.”).

. Daniel Pipes, Two Decades of the Rushdie Rules, Commentary 31 (October 2010).

. Geert Wilders, a member of the Dutch Parliament, was prosecuted in the Netherlands for "insult[s] to a group of people because of their ... religion,” though he was acquitted after two years of litigation. Geert Wilders, Op-Ed, In Defense of Hurtful Speech, Wall St. J., June 24, 2011, at A13.

. The Paquete Habana, 175 U.S. 677, 711, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

. The Antelope, 23 U.S. (10 Wheat.) 66, 75, 6 L.Ed. 268 (1825).

. Thomas LL Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L.Rev. 830, 855 (2006) (describing how "the United States was the newest and weakest member of the Eurocentric world, and the Republic!] ... would benefit from reciprocal treatment in the capitals of the more powerful and established European sovereigns”).

. Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254 (2d Cir.2007).

. President Thabo Mbeki, Statement by President Thabo Mbeki to the National Houses of Parliament and the Nation of South Africa, on the Occasion of the Tabling of the Report of the Truth and Reconciliation Commission (Apr. 15, 2003); see also Khulumani, 504 F.3d at 299-300 (Korman, J., dissenting).

. Joshua Kleinfeld, Skeptical Internationalism: A Study of Whether International Law is Law, 78 Fordham L.Rev. 2451, 2521 (2010).